Case 0:26-cv-61714-WPD   Document 1   Entered on FLSD Docket 06/16/2026   Page 1 of 59

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

TERESA LATIMORE, individually,
and on behalf of all others similarly situated,

        Plaintiff,

v.

ADVANCED RECOVERY SYSTEMS LLC
d/b/a THE RECOVERY VILLAGE,

        Defendant.

_____/

CASE NO. _____

CLASS ACTION

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW Plaintiff Teresa Latimore ("Plaintiff" or "Ms. Latimore"), individually and on behalf of all others similarly situated, by and through undersigned counsel, and sues Defendant Advanced Recovery Systems LLC d/b/a The Recovery Village ("ARS" or "Defendant"), and in support thereof alleges as follows:

**NATURE OF THE ACTION**

1. This is a class action lawsuit arising from the collection and disclosure of website visitors' sensitive personal health information—specifically, their addiction-treatment-seeking communications and related health and personal data—by Defendant ARS to Google LLC ("Google") and Microsoft Corporation ("Microsoft") (collectively, the "Third-Party Recipients"), without prior notice and consent, through tracking mechanisms embedded in Defendant's website, www.therecoveryvillage.com (the "Website").

2. ARS operates one of the largest behavioral healthcare organizations in the United States, doing business as The Recovery Village. Through its Website, ARS enables individuals

1

struggling with substance use disorders to assess their addiction, locate treatment centers nationwide, initiate the admissions process, verify their insurance coverage, and contact ARS's admissions team. Every page of the Website is directed at one of the most vulnerable populations imaginable: people battling addiction who are gathering the courage and practical information needed to seek help.

3. The act of visiting the Website is not ordinary internet browsing. A person who browses treatment options for heroin addiction, completes an "Am I an Alcoholic?" self-assessment, searches for a nearby rehabilitation facility, verifies whether their insurance covers drug and alcohol treatment, or calls the admissions line directly from the Website has disclosed something profoundly private: that they may be struggling with a substance use disorder and are considering treatment. No other medical condition carries the same pervasive social stigma and concrete real-world consequences as addiction.

4. People who are identified as seeking substance abuse treatment risk significant harm to their lives. Employers routinely terminate employees discovered to have addiction issues. Custody courts weigh evidence of substance use against parents in custody disputes. Landlords discriminate against people in recovery. Professional licensing boards can suspend or revoke licenses based on disclosed addiction. Security clearances can be denied or revoked. Immigration applications can be jeopardized. Colleagues, neighbors, family members, and communities still stigmatize those who seek help for addiction, deterring the very treatment-seeking that saves lives. The fear of exposure is a documented barrier to recovery that Congress, the federal government, and the State of Florida have all recognized by enacting special legal protections for this uniquely sensitive category of information.

2

5.      Congress enacted 42 U.S.C. § 290dd-2 and its implementing regulations at 42 C.F.R. Part 2 ("Part 2"), which impose protections on records of patients in federally assisted substance use disorder treatment programs that are stricter than even HIPAA provides. Part 2 prohibits any disclosure of patient identifying information from such programs without patient consent or a specific court order, and expressly prohibits using such records for law enforcement, employment, or other adverse purposes. Congress specifically designed Part 2 to overcome patients' fears that records about their substance abuse treatment would be used against them. Similarly, Fla. Stat. § 397.501 independently protects records of substance abuse service providers relating to the identity, diagnosis, prognosis, and service provision to any individual seeking or receiving substance abuse services, prohibiting disclosure without written consent, subject only to narrow exceptions.

6.      Despite these legal protections—and despite publishing a HIPAA Notice of Privacy Practices that expressly prohibits disclosing patient health information for marketing purposes without written authorization—ARS has knowingly implemented three tracking tools operated by two Third-Party Recipients on its Website: the Google Analytics Tracker (operated by Google), and Microsoft Clarity and Microsoft Bing Universal Event Tracking (both operated by Microsoft) (collectively, the "Trackers" and each individually, a "Tracker"). When Website visitors complete online addiction assessments and quizzes, view pages about specific addictions and treatment programs, begin the admissions process, search for nearby treatment facilities, check insurance coverage, or click to call ARS's admissions line, ARS procures these Third-Party Recipients to intercept those electronic communications without consent. The intercepted data is transmitted in real time to Google and Microsoft, along with unique identifying cookies that link those transmissions to the individual user.

7.	What makes ARS's conduct particularly egregious is the nature of the information revealed. Through the Trackers, Google and Microsoft learn the specific addiction-related topics the user is researching, the specific assessments they are completing (such as "Am I addicted to heroin?"), the geographic locations of treatment facilities they are seeking, the insurance carrier they are using to pay for addiction treatment, and whether they initiated a call to an addiction treatment admissions line—all linked to persistent, unique browser identifiers that enable Google and Microsoft to build advertising profiles around the user's addiction treatment-seeking status. ARS then benefits commercially from the analytics, retargeting, and advertising optimization that these transmissions enable.

8.	This interception of private electronic communications occurs without appropriate notice to visitors and without obtaining their consent, in violation of (1) the Florida Security of Communications Act, Florida Statutes § 934.01, et seq. ("FSCA") and (2) the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511 et seq. ("ECPA"). Further, ARS was unjustly enriched by the unauthorized commercial exploitation of Plaintiff's and Class members' sensitive personal and health-related information.

9.	Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the consent of all parties to the communication. ARS violated the FSCA by deliberately embedding tracking technologies on its Website that procured Google and Microsoft to intercept users' private electronic communications—including page views of specific addiction assessments, insurance selections, location searches, and admissions interactions—in real time, without the knowledge or consent of any party to those communications.

10. Under the ECPA, similar protections exist at the federal level. Although the ECPA contains a one-party consent exception, that exception does not apply here because ARS procured the interceptions for the purpose of committing criminal or tortious acts—specifically, the unauthorized use and disclosure of individually identifiable health information for commercial advantage in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6; the unauthorized disclosure of records and information relating to the identity, diagnosis, prognosis, and service provision of individuals seeking or receiving substance-abuse services, in violation of Fla. Stat. § 397.501(7); and the unauthorized use and disclosure of substance-use-disorder patient-identifying information maintained in connection with a federally assisted substance-use-disorder treatment program, in violation of 42 U.S.C. § 290dd-2 and its implementing regulations at 42 C.F.R. Part 2.

11. Plaintiff also brings a claim for unjust enrichment. Defendant derived substantial economic benefit—including reduced advertising costs, enhanced behavioral targeting data, and improved marketing performance—from the unauthorized interception and commercial use of Plaintiff's and Class members' private health information. Because Defendant obtained these benefits without notice, consent, or compensation to Plaintiff and the Class, equity requires restitution and disgorgement of such ill-gotten gains.

12. Through this action, Plaintiff seeks to hold ARS accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent the continued procurement of interception of electronic communications through Defendant's Website.

**PARTIES**

13. Plaintiff Teresa Latimore is an adult citizen and Florida resident residing in Daytona Beach, Florida.

14.     Defendant ARS is a limited liability company organized and existing under the laws of the State of Delaware. ARS does business as "The Recovery Village" and is headquartered in Fort Lauderdale, Florida. Founded in 2013, ARS is a physician-led behavioral healthcare organization that operates a national network of addiction treatment and co-occurring mental health treatment centers. ARS provides a full continuum of care, including medical detox, inpatient rehabilitation, outpatient programs, and aftercare services. ARS employs approximately 488 people in the United States and reports annual revenue of approximately $100 million. ARS maintains and operates the Website at www.therecoveryvillage.com.

**JURISDICTION AND VENUE**

15.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges questions of federal law under the ECPA (18 U.S.C. § 2511, et seq.).

16.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a) because Plaintiff's state-law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

17.     This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

18.     This Court has personal jurisdiction over Defendant because ARS's principal place of business is in Fort Lauderdale, Florida. Further, ARS operates its Website from Florida and directs its business activities throughout the State of Florida, including the Southern District of Florida. ARS intentionally deployed tracking code on its Website that intercepted the electronic

6

communications of Florida residents, including Plaintiff, within this District, giving rise to the claims asserted herein.

19.     Venue is proper in the Fort Lauderdale Division of the Southern District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District. ARS's tracking conduct is nationwide in scope and the Website is accessible to and used by consumers throughout the Southern District, where ARS maintains its principal place of business.

## FACTUAL ALLEGATIONS

### A.  Overview of Website Tracking on Substance Abuse Treatment Websites

20.     Many websites employ tracking technologies that collect personal data about users' online activities. These tracking technologies have become ubiquitous across the internet, collecting vast amounts of data about user behavior, preferences, and interests. In the healthcare context, these technologies are particularly concerning because they can capture sensitive medical information, including the types of treatments a user is researching, the medical professionals they are seeking, and the health conditions they may be experiencing.

21.     The interception of substance abuse treatment-related communications through these tracking technologies is especially alarming. Unlike a general health topic, information indicating that an individual is researching or seeking substance use disorder treatment implicates a uniquely sensitive category of information entitled to the highest order of legal protection. When a user visits an addiction treatment website, views or completes assessments for alcohol or drug addiction, searches for nearby rehabilitation facilities, or calls an admissions line, those interactions reveal the user's possible substance use disorder status—information that can be

weaponized for employment discrimination, exploited in custody proceedings, and used to stigmatize and harm the individual in ways that have no analogue in general health browsing.

22.     As detailed in this Complaint, ARS has implemented multiple tracking technologies on its Website, resulting in the unauthorized interception of visitors' electronic communications by Google and Microsoft.

**B. The Special Sensitivity of Substance Abuse Treatment Information and Applicable Confidentiality Protections**

23.     Substance use disorders carry a stigma unlike virtually any other medical condition. Despite addiction being recognized by the medical and scientific community as a chronic brain disorder, individuals who seek treatment for drug or alcohol addiction routinely face discrimination in employment, housing, professional licensing, custody proceedings, and personal relationships. The shame and fear of exposure prevent countless individuals from seeking the treatment they need, contributing to overdose deaths and untold personal suffering. It is precisely this reality that animates the extraordinary legal protections that federal and state law have erected around substance abuse treatment information.

24.     Congress enacted 42 U.S.C. § 290dd-2 and its implementing regulations at 42 C.F.R. Part 2 to provide heightened confidentiality protections for records of substance use disorder patients in federally assisted treatment programs. Part 2 is significantly stricter than HIPAA: it prohibits the disclosure of patient identifying information from covered programs without patient consent, subject only to very narrow exceptions, and expressly prohibits using such records for law enforcement, criminal prosecution, employment, or other adverse purposes. The legislative history of Part 2 makes clear that Congress enacted these protections specifically to overcome patients' fears that their records could be used against them, thereby encouraging people to seek the treatment they need.

25.     Florida enacted Fla. Stat. § 397.501 to independently protect individuals receiving substance abuse services under state law. Florida Statute § 397.501(7)(a) provides that records of substance abuse service providers relating to the identity, diagnosis, prognosis, and service provision to any individual are confidential and may not be disclosed without the written consent of the individual, subject only to narrow statutory exceptions not applicable here. The statute further provides that such records are confidential under Florida law and applicable federal confidentiality regulations. Like Part 2, Florida's statute reflects the Legislature's recognition that the privacy of individuals seeking addiction treatment must be zealously guarded.

26.     A person's act of visiting The Recovery Village website is not merely "browsing the internet." In context, browsing pages about heroin addiction, completing an alcoholism self-assessment, searching for nearby rehab facilities, verifying insurance coverage for addiction treatment, or calling an addiction treatment admissions line identifies the visitor as someone who is at minimum considering substance use disorder treatment. This category of information is precisely what § 397.501 and Part 2 were designed to protect. ARS's systematic disclosure of this information to advertising companies, without users' knowledge or consent, violates the letter and spirit of these laws and constitutes a profound invasion of its users' most private information.

27.     In addition to § 397.501 and Part 2, ARS's conduct also violates HIPAA, 42 U.S.C. § 1320d-6, which prohibits covered healthcare entities from disclosing individually identifiable health information without authorization for commercial purposes. ARS is a covered healthcare entity that publicly acknowledges its HIPAA obligations in its own published Notice of Privacy Practices. As described below, ARS's deployment of the Trackers constitutes the unauthorized disclosure of protected health information for advertising and analytics purposes.

9

C. **The Google Analytics Tracking Technology**

28.     Google is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms, generating over $200 billion in annual revenue primarily through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its numerous products and services, which it then leverages to deliver targeted advertisements. ARS has implemented the Google Analytics Tracker on its Website.

29.     The Google Analytics Tracker is a JavaScript-based tracking technology. Website owners implement the Tracker by adding a snippet of JavaScript code to their website's source code. Once implemented, the Tracker loads automatically whenever a user visits a page containing the Tracker's source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors.

30.     The Google Analytics Tracker intercepts and collects various data points about user interactions with a website and transmits details of these interactions to Google. Along with these events, the Tracker transmits unique identifying cookies, including the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies. The 3PSID, 3PAPISID, and 3PSIDCC cookies allow Google to identify users who are signed into their Google accounts (e.g., via Gmail or Chrome), thereby linking browsing activity on third-party websites to an authenticated Google identity. The NID cookie collects information from users even when they are not signed into a Google account, enabling tracking regardless of authentication or login status. These cookies enable Google to create comprehensive user profiles and are third-party marketing cookies, meaning the information does not stay within the site but is sent to Google itself. These cookies constitute personally

identifiable information ("PII") as they are unique to each user and may be used to identify individuals.

31.    The data gathered by these cookies is used to create user profiles based on individual interests, enabling Google to deliver more targeted advertisements. When that data includes information about a user's addiction treatment-seeking activity—such as viewing pages about heroin addiction treatment or completing an alcoholism assessment—the resulting advertising profile incorporates the user's sensitive health information.

**D. The Microsoft Advertising Ecosystem (Clarity and Bing Universal Event Tracking)**

32.    Microsoft collects user data through its Clarity analytics tool and Bing Universal Event Tracking ("Bing UET") advertising service. ARS has implemented both Microsoft Clarity and Bing UET on its Website.

33.    Microsoft Clarity is a behavioral analytics tool that tracks user interactions on websites, including which pages users view, where they click, and how they scroll. Bing UET is connected to Microsoft's search and advertising network and enables Microsoft to build targeted advertising profiles based on users' website interactions.

34.    When a user visits a website that uses Microsoft Clarity or Bing UET, information about their actions on the site is automatically transmitted to Microsoft along with the MUID (Microsoft User ID) cookie. The MUID cookie serves as a persistent browser-level identifier that Microsoft uses to recognize the same user across different and unrelated websites that also use Microsoft tracking technologies, enabling Microsoft to consolidate activity into unified behavioral profiles. Both Clarity and Bing UET rely on the MUID cookie as a core identifier. The MUID cookie contains a unique browser identifier or, when applicable, an ID associated with the user's

11

Microsoft account and constitutes PII as it is unique to each user and may be used to identify individuals.

35.     Microsoft's Privacy Policy confirms that it uses the data collected to "advertise and market to you, which includes sending promotional communications, targeting advertising, and presenting you with relevant offers." Microsoft further expressly states: "In carrying out these purposes, we combine data we collect from different contexts (for example, from your use of two Microsoft products) or obtain from third parties to give you a more seamless, consistent, and personalized experience."

36.     Microsoft Bing UET also collects the user's IP address along with the MUID cookie. The MUID cookie has an expiration of 13 months. Put simply, Microsoft clarifies that Bing UET collects both behavioral data and technical identifiers, including the MUID cookie. Both Clarity and Bing UET rely on the MUID cookie as a core identifier to link user interactions with analytics and advertising data across Microsoft's ecosystem.

**E. ARS Shares Users' Private Health and Addiction Treatment Information with Third Parties**

37.     Through the Website, users can perform a range of activities, including completing online addiction assessment questionnaires and quizzes, beginning the admissions process, searching for nearby treatment facilities, verifying insurance coverage, and calling ARS's admissions team. Users communicate their private and personal information via the site, including protected health information ("PHI"). Unbeknownst to the Website's users, ARS is surreptitiously sharing private and protected information with Google and Microsoft without users' consent.

38.     When a user visits the Website, their browser sends an HTTP request to the Website's server to load the page. In response, the server sends back the webpage, which contains a small piece of code known as a tracker or pixel. The tracker or pixel instructs the browser to send

the user's identifying data like cookies, browser details, and device information, to a third-party tracking service. This allows the tracker or pixel to monitor user activity and gather insights about the users' behavior on the site. The sections below describe users' interactions with the Website and how they are shared with the Third-Party Recipients in real time.

### i.   User Admissions and Self-Assessments

39.     A user may begin the admission process to one of ARS's programs by hovering over the "Admissions" menu and clicking the "Start Admission Online" button located on the Website's homepage. The homepage, shown below, prominently features calls to action for insurance verification, location search, and admissions, prominently displaying ARS's phone number at the top of every page.



*The website's homepage.*

40.     When a user clicks the "Start Admission Online" button from the Admissions toolbar on the Website's homepage, as shown below, they are directed to the online admission or self-assessment form.

13



*"Start Admission Online" button from the "Admissions" toolbar on the website's homepage.*

41.     The fact that a user has accessed the Start Admission Online page—a page specifically designed for individuals initiating the intake process at a drug and alcohol rehabilitation facility—is precisely the kind of sensitive substance abuse service information that Fla. Stat. § 397.501 and 42 C.F.R. Part 2 exist to protect. That a person has reached this page reveals that they are actively seeking admission to addiction treatment. ARS transmits this page visit to Google and Microsoft in real time. The image below shows the Start Admission Online page as viewed by a user:



*"Start Admission Online" page viewed by user. No terms and conditions are presented before the user interacts with the admissions form.*

42. As shown in the marked-up image below, the user's page view of the Start Admission Online page is transmitted to Google through Google Analytics along with the user's unique Google identifying cookies, including the __Secure-3PSID, __Secure-3PAPISID, __Secure-3PSIDCC, and NID cookies. For users signed into a Google account, these cookies directly link the page visit to the user's authenticated Google identity:



*Start Admission Online page view transmitted to Google through Google Analytics with the __Secure-3PSID, __Secure-3PAPISID, __Secure-3PSIDCC, and NID identifying cookies.*

43.     As shown below, the same Start Admission Online page view is also transmitted to Microsoft through Clarity, along with the user's unique MUID cookie:



*Start Admission Online page view transmitted to Microsoft through Clarity with the MUID identifying cookie.*

44.     As shown below, the Start Admission Online page view is further transmitted to Microsoft through Bing UET, along with the MUID cookie:



*Start Admission Online page view transmitted to Microsoft through Bing UET with the MUID identifying cookie.*

45.     In addition to the admissions page, users can complete online self-assessment questionnaires and quizzes designed to evaluate potential substance dependencies and assess the severity of their condition. For example, users may access the "Am I an Alcoholic?" assessment from the Resources section of the Website's homepage, as shown below:



*"Am I An Alcoholic?" button from the "Resources" section of the website's homepage.*

46.      When a user navigates to the "Am I an Alcoholic?" quiz page to assess whether they may have an alcohol use disorder, as shown below, that page visit is intercepted and transmitted in real time to Google and Microsoft:



*"Am I an Alcoholic?" quiz page viewed by user.*

47.      The user's page view of the "Am I an Alcoholic?" assessment is transmitted to Google through Google Analytics along with the user's unique Google identifying cookies, as shown in the marked-up image below:

18



*"Am I An Alcoholic?" page view transmitted to Google through Google Analytics with identifying cookies.*

48. The same page view is also transmitted to Microsoft through Clarity with the MUID cookie, as shown below:



*"Am I An Alcoholic?" page view transmitted to Microsoft through Clarity with the MUID identifying cookie.*

49. As shown below, the page view is also transmitted to Microsoft through Bing UET with the MUID cookie:



*"Am I An Alcoholic?" page view transmitted to Microsoft through Bing UET with the MUID identifying cookie.*

50.   Users may also navigate from the "Our Programs" or "Resources" menu to condition-specific pages such as the Meth Addiction page, which discusses methamphetamine use disorder and available treatment options. The image below shows the Meth Addiction link accessible from the Website's menus:



*"Meth Addiction" option accessible from the website's "Resources" and "Our Programs" menus.*

51.     When a user views the Meth Addiction page, as shown below, that page visit—revealing research into methamphetamine use disorder—is intercepted and transmitted in real time to Google and Microsoft:



*"Meth Addiction" page viewed by user.*

52.     The user's page view of the Meth Addiction page is transmitted to Google through Google Analytics with the user's unique identifying cookies, as shown below:



*" Meth Addiction" page view transmitted to Google through Google Analytics with identifying cookies.*

53.     The same page view is transmitted to Microsoft through Clarity, as shown below:



*"Meth Addiction" page view transmitted to Microsoft through Clarity with the MUID identifying cookie.*

54.     As shown below, the page view is also transmitted to Microsoft through Bing UET:



*"Meth Addiction" page view transmitted to Microsoft through Bing UET with the MUID identifying cookie.*

55.     The Website also features an "All Addiction Assessments" menu that provides access to substance-specific drug addiction assessments. The button leading to this drug assessment menu is shown below:



*"All Addiction Assessments" button leading to the full drug assessment menu.*

56.     Within the addiction assessments menu, users may select specific substances—such as heroin—to access targeted addiction self-assessments. The image below shows the "Heroin" button within the drug assessment menu:



*"Heroin" button in the addiction assessment drug menu.*

57.     When a user clicks on the heroin assessment option and views the "Am I Addicted to Heroin?" page, as shown below, that page visit reveals that the user may be concerned about heroin dependence—one of the most sensitive and stigmatizing disclosures imaginable. This information is intercepted and transmitted in real time to Google and Microsoft:



*"Am I Addicted to Heroin?" page viewed by user.*

24

58.     As shown in the marked-up images below, the user's page view indicating research into heroin addiction is transmitted to Google through Google Analytics and to Microsoft through Clarity and Bing UET, each along with the user's unique identifying cookies:



*"Do I Have a Heroin Addiction?" page view transmitted to Google through Google Analytics with identifying cookies.*



*"Do I Have a Heroin Addiction?" page view transmitted to Microsoft through Clarity with the MUID identifying cookie.*



*"Do I Have a Heroin Addiction?" page view transmitted to Microsoft through Bing UET with the MUID identifying cookie.*

### ii.    Users Search for Treatment Locations and Insurance Coverage

59.    At the bottom of every page on the Website, a banner appears stating: "Find A Center Near You — Find The Recovery Village Drug, Alcohol and Mental Health Rehab nearest you." Within this banner, users can select their state to locate nearby ARS rehabilitation facilities. When a user selects a state—such as "Florida"—from the dropdown menu, as shown below, the information entered, along with referring URL data, is transmitted to Google and Microsoft:



*Find A Center Near You banner with "Florida" selected by user.*

60.     Upon selecting their state, the user is presented with ARS's nearby rehabilitation facility locations. The image below shows the Florida treatment facility locations presented to a user who selected "Florida":



*ARS's Florida treatment locations displayed to user.*

61.     As shown in the marked-up images below, the user's selection of "Florida" as their desired treatment location—along with the referring URL, which may indicate the substance-specific page from which the user accessed the banner—is transmitted to Google through Google Analytics and to Microsoft through Bing UET, each with the user's unique identifying cookies:



*User's "Florida" location selection transmitted to Google through Google Analytics with identifying cookies. Note that the referring page URL is also transmitted, disclosing the substance-specific page from which the user navigated.*



*User's "Florida" location selection transmitted to Microsoft through Bing UET with the MUID identifying cookie.*

62.   Similarly, users may hover over the "Insurance" tab on the Website's homepage to verify whether their health insurance covers ARS's addiction treatment programs. The Insurance bar on the homepage is shown below:



*Insurance verification bar on the website's homepage.*

63.   When a user selects their insurance carrier—for example, Cigna—from the insurance verification section, as shown below, the identity of that insurance carrier in the context of addiction treatment coverage is transmitted to Google and Microsoft:



*User viewing the "Cigna" insurance coverage verification page on the website.*

64.     As shown in the marked-up images below, the user's selection of Cigna as their insurance carrier in the context of addiction treatment coverage verification is transmitted to Google through Google Analytics and to Microsoft through Bing UET, each with the user's unique identifying cookies. This transmission discloses not only the user's insurance carrier, but the fact that the user is checking whether that carrier covers substance abuse treatment:



*User's selection of "Cigna" insurance for addiction treatment coverage transmitted to Google through Google Analytics with identifying cookies.*



*User's selection of "Cigna" insurance for addiction treatment coverage transmitted to Microsoft through Bing UET with the MUID identifying cookie.*

### iii.    User Phone Interactions with ARS

65.    On every page of the Website, ARS's admissions phone number is prominently displayed at the top of the screen. When a user initiates a call to the admissions facility by clicking

the displayed phone number, as shown below, the call event—including the specific phone number contacted—is transmitted to third parties:



*ARS's admissions phone number (clickable) prominently displayed on the website's homepage on every page.*

66.     As shown in the marked-up image below, when a user clicks the ARS phone number, the clicked phone number is transmitted in full to Microsoft through Clarity. The act of clicking an admissions phone number on a substance abuse treatment website is itself a highly sensitive disclosure, indicating that the user has made the decision to personally contact an addiction treatment facility:

32



*The clicked ARS admissions phone number transmitted in full to Microsoft through Clarity with the MUID identifying cookie.*

### iv.  User Search Activity

67.    At the top-right corner of every page on the Website, ARS provides a free-text search bar that users may use to search for addiction-related topics and treatment information. When a user enters a search term—such as "cocaine addiction"—as shown below, that search query, along with the information it reveals about the user's addiction concerns, is transmitted to Google and Microsoft:



*User searching for "cocaine addiction" in the website's search bar.*

68.     After pressing Enter, the user is presented with search results related to cocaine addiction, as shown below:



*User's page view after searching for "cocaine addiction" on the website.*

69.     As shown in the marked-up images below, the user's search query for "cocaine addiction" is transmitted to Google through Google Analytics and to Microsoft through Bing UET,

each with the user's unique identifying cookies. The search term—along with the URL encoding

the search query—constitutes "content" within the meaning of the FSCA, as it reveals the specific

substance the user is researching in the context of addiction treatment:



*"Cocaine addiction" search term transmitted to Google through Google Analytics with identifying cookies.*



*"Cocaine addiction" search term transmitted to Microsoft through Bing UET with the MUID identifying cookie.*

35

### v.   User Browsing Activity Across All Pages of the Website

70.   The interception of users' electronic communications is not limited to specific assessments, location searches, insurance verifications, or call events. Every page a user visits on ARS's Website—including pages describing specific substance use disorders, treatment programs, medical conditions, and recovery resources—is intercepted and transmitted to the Third-Party Recipients in real time, along with their respective unique identifying cookies. Through these transmissions, Google and Microsoft learn not only that the user visited the Website, but the specific addiction-related topics and substance use disorders the user was researching.

71.   Critically, none of this information-sharing occurs with users' knowledge or consent. A user completing an addiction assessment or browsing information about heroin treatment has no reason to believe their private health-related interactions are being simultaneously transmitted to advertising companies. The tracking code executes in the background, entirely invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms.

### F.   Defendant's Responsibility for the Interception of Electronic Communications

72.   Although the Trackers perform the technical functions of intercepting electronic communications, ARS bears full legal responsibility for these actions under the FSCA and ECPA as the entity that has procured Google and Microsoft to intercept these communications.

73.   ARS knowingly made the affirmative decision to implement the Google Analytics Tracker, Clarity, and Bing UET on its Website. This implementation was deliberate and required Defendant, or persons acting on its behalf, to configure and deploy the Trackers on the Website.

Without ARS's implementation and continued operation of this code, the Third-Party Recipients would not have received the electronic communications at issue.

74.      Defendant controls, or has the practical ability to control, which pages and events on its Website contain or trigger the tracking code. ARS could exclude tracking from sensitive pages and assessments where addiction-related health information is accessed or inputted, yet chose to deploy tracking throughout the Website, including on the self-assessment questionnaires, admissions pages, substance-specific information pages, and interactive features where the most sensitive information is encountered.

### G.  ARS's Privacy Policy Does Not Authorize the Tracking Conduct

75.      ARS's Website includes a cookie banner that briefly appears upon entry to the Website and quickly disappears, as well as a Privacy Policy linked from that banner. The cookie banner appears on page load but disappears after only a few seconds, even if the user takes no action, and is replaced by a nearly-invisible toolbar at the bottom of the screen that is extremely difficult to locate. The banner, as shown below, must disappear and reappear for a user to meaningfully interact with it:



*The website's cookie banner, which appears briefly on page load and disappears within seconds.*

76.     Users are not required to affirmatively agree to ARS's Privacy Policy before completing addiction assessments, initiating admissions, searching for treatment locations, or otherwise interacting with the Website. The cookie banner mechanism fails to obtain meaningful consent: it is transient, obscure, and provides no clear disclosure that the user's addiction treatment-related browsing activity will be transmitted to Google and Microsoft in real time.

77.     ARS's Privacy Policy, which is only accessible through the cookie banner and not from the homepage or any legal resources section of the Website, contains internal contradictions that render it inadequate as a consent mechanism. Screenshots of the Privacy Policy are shown below:

**How We Use Personal Information**

1. We collect Personal Information in the normal course of business in order to serve you better.
2. Unless otherwise stated, we do not sell, trade or give away your Personal Information to anyone.
3. Unless otherwise stated, we do not disclose your Personal Information to third parties.

**We may also use Personal Information:**

- to respond to your inquiries and fulfill your requests;

- to inform you about important information regarding the Site or services which may interest you or changes to terms, conditions, and policies and/or other administrative information;

- to deliver marketing communications that we believe may be of interest to you, including, ads or offers tailored to you, including ads on other websites;

- to personalize your experience on the Site;

- to verify your identity and/or location (or the identity or location of your representative or agent) in order to allow access to your services, conduct online transactions and to maintain measures aimed at preventing fraud and protecting the security of your Personal Information;

- to allow you to participate in surveys and other forms of market research;

- to send you e-mails regarding system downtime and/or changes to this Privacy Policy or the Terms and Conditions of Use.

- for business purposes, including data analysis, audits, developing and improving services, enhancing the Site, identifying usage trends and determining the effectiveness of web pages; and

- for risk control, for fraud detection and prevention, to comply with laws and regulations, and to comply with other legal process and law enforcement requirements.

*Screenshot of the website's Privacy Policy.*

**How Personal Information is Shared**

This Online Privacy Policy describes how Personal Information may be shared and how you may be able to limit certain types of sharing. Among the reasons for sharing information is for cross-marketing purposes with Company's subsidiaries and affiliates. We also share non-personally identifiable information about our user base with our advertising affiliates who drive traffic to our Site to help them identify and target our ideal visitor/patient.

**Other Information/Personal Data We Collect Online**

Other Information is any information other than Personal Information that does not reveal your specific identity or does not directly relate to an individual, such as browser information, information collected through cookies, pixel tags and other technologies, demographic information, and aggregated and de-identified data.

**How We Collect and Use Other Information**

We and our third-party service providers may collect and use other information in a variety of ways, including:

- **Through your browser or device:** Certain information is collected by most browsers and/or through your device, such as your Media Access Control (MAC) address, device type, screen resolution, operating system version and internet browser type and version. We use this information to ensure Sites function properly, for fraud detection and prevention, and security purposes.

- **Using cookies:** Cookies are pieces of information stored directly on the device you are using. Cookies we use do not contain or capture unencrypted Personal Information. Cookies allow us to collect information such as browser type, time spent on the Site, pages visited, language preferences, and your relationship with us. We use the information for security purposes, to facilitate navigation (i.e. to store your account information between sessions), to display information more effectively, to personalize/tailor your experience while engaging with us, and to recognize your device to allow your use of our online products and services.

We collect statistical information about the usage of the Site in order to continually improve the design and functionality, to monitor responses to our advertisements and content, to understand how visitors use the Site and to assist us with resolving questions regarding the Site. We also utilize cookies for advertising purposes. Please see the Advertising section below for more information.

*Screenshot of the website's Privacy Policy (continued).*

39

*Screenshot of the website's Privacy Policy (continued).*

*Screenshot of the website's Privacy Policy showing cookie disclosure provisions.*

78.     The Privacy Policy states that ARS "may use Personal Information … to deliver marketing communications … including ads or offers tailored to you, including ads on other websites," yet separately asserts that the cookies employed "do not contain or capture unencrypted Personal Information." These two statements cannot be reconciled. Moreover, the Privacy Policy claims that Google Analytics collects only IP addresses and that ARS "does not combine" such data with personally identifiable information, while simultaneously acknowledging the use of cookies and analytics "for advertising purposes." These contradictions render the Privacy Policy

40

vague, misleading, and inadequate to constitute meaningful consent to the specific tracking conduct alleged herein.

79.     Even if the cookie banner and Privacy Policy could theoretically constitute some form of notice, browsewrap agreements are only enforceable when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice before they engage with the website. *See Farsian v. Alphalete Athletics, LLC*, 2025 WL 1591452, at *4 (S.D. Fla. Feb. 25, 2025); *Tejon v. Zeus Networks, LLC*, 725 F. Supp. 3d 1351, 1355 (S.D. Fla. 2024). ARS's fleetingly displayed, design-obscured cookie banner fails this test. It disappears within seconds and is replaced by a nearly invisible toolbar, providing no meaningful opportunity for a user to read, understand, or consent to disclosure of their addiction treatment-related health information to advertising companies.

80.     ARS's own Notice of Privacy Practices (the "Notice") further confirms that the tracking conduct is unauthorized. As shown in the marked-up image below, the Notice expressly states that ARS will not use or disclose users' health information for marketing purposes without their written authorization. The Trackers violate this representation by transmitting protected health information to Google and Microsoft for precisely such commercial advertising and analytics purposes, without any written authorization from users:

**OTHER USES AND DISCLOSURES:**

Use or disclosure of your health information for any purpose other than those listed above requires your written authorization. Some examples include:

- Psychotherapy Notes: We will not use and disclose your psychotherapy notes without your written authorization except as otherwise permitted by law.

- Release of Your Presence in Our Facility: We will not disclose your presence in treatment to individuals who may call or present in person at a facility unless you have provided your written authorization permitting the release.

- Marketing: We will not use or disclose your health information for marketing purposes without your written authorization except as otherwise permitted by law.

- Sale of Your Health Information: We will not sell your health information without your written authorization except as otherwise permitted by law.

If you change your mind after authorizing a use or disclosure of your health information, you may withdraw your permission by revoking the authorization. However, your decision to revoke the authorization will not affect or undo any use or disclosure of your health information that occurred before you notified us of your decision, or any actions that we have taken based upon your authorization. To revoke an authorization, please notify us by mail at Advanced Recovery Systems, LLC, Attn: Compliance, 100 SE Third Ave, Suite 1800, Ft Lauderdale, FL 33394 or by contacting our Privacy Officer by telephone at 754-300-3120 ext. 4019 or by email at compliance@advancedrecoverysystems.com.

*The Website's Notice. The highlighted provisions expressly prohibit marketing uses of health information without written authorization—a prohibition violated by ARS's deployment of the Trackers.*

### H.  ARS's Conduct Violates HIPAA, Fla. Stat. § 397.501, and 42 U.S.C. § 290dd-2

81.     ARS is a healthcare provider and covered entity under HIPAA as defined in 45 C.F.R. § 160.103. ARS provides addiction treatment and related healthcare services, coordinates consultations with healthcare professionals, collects insurance and payment information, and maintains information concerning consumers' addiction conditions, treatment needs, and insurance coverage. ARS publishes a HIPAA Notice of Privacy Practices acknowledging that it uses and discloses protected health information for treatment, payment, and healthcare operations. Those representations confirm, or at minimum plausibly support, that ARS is a covered entity under HIPAA.

82.     PHI is defined as "individually identifiable health information" that is (i) transmitted by electronic media; (ii) maintained in electronic media; or (iii) transmitted or maintained in any other form or medium. 45 C.F.R. § 160.103. Individually identifiable health information ("IIHI") is defined in 45 C.F.R. § 160.103 as any health information that is: (1) created or received by a healthcare provider; (2) relates to an individual's past, present, or future physical

or mental health or condition; and (3) either identifies the individual or provides a reasonable basis to believe the individual can be identified.

83.     When users visit the Website and interact with addiction assessment pages, admissions forms, substance-specific treatment information pages, insurance verification tools, and the call-to-admissions feature, they disclose information relating to their substance use disorders, addiction status, treatment needs, and insurance coverage—all of which relate to their past, present, or future physical health or condition. This information, when combined with identifiers such as the Google Analytics and Microsoft tracking cookies (*e.g.,* MUID), qualifies as PHI because it is (1) individually identifiable and (2) relates to the user's health status. The cookies and device identifiers transmitted alongside users' health-related interactions constitute "unique identifying number[s], characteristic[s], or code[s]" under 45 C.F.R. § 164.514(b)(2)(i), qualifying as indirect identifiers. When those identifiers travel in the same payload as the addiction-related page visits and interactions, the combined dataset becomes individually identifiable health information, and therefore PHI.

84.     Under HIPAA, it is unlawful for a covered entity to knowingly disclose individually identifiable health information without authorization with intent to sell, transfer, or use such information for commercial advantage, personal gain, or malicious harm. 42 U.S.C. § 1320d-6. ARS did not deploy the Trackers merely for passive website maintenance. It deployed and used them for commercial purposes, including advertising analytics, conversion measurement, retargeting, audience building, and optimization of its admissions sales funnel. ARS's deployment of the Trackers, which results in the automatic transmission of users' PHI to Google and Microsoft for those commercial purposes, constitutes an unauthorized disclosure of PHI in violation of HIPAA.

85.     Upon information and belief, ARS has not executed HIPAA-compliant Business Associate Agreements ("BAAs") with Google or Microsoft for the tracking activities described herein and has not obtained the HIPAA-compliant patient authorizations necessary to permit such disclosures for non-treatment purposes.

86.     ARS had actual and constructive knowledge that its deployment of third-party trackers on its Website violated HIPAA. In December 2022, the U.S. Department of Health and Human Services Office for Civil Rights issued guidance expressly warning HIPAA-covered entities and business associates that the use of third-party tracking technologies on websites—including pixel tracking tools—that transmit protected health information to third-party vendors without a valid BAA constitutes an unauthorized disclosure in violation of HIPAA. ARS, which publishes its own HIPAA Notice of Privacy Practices and affirmatively represents to users that it handles PHI subject to HIPAA, cannot credibly claim ignorance of this well-publicized federal guidance.

87.     In addition to HIPAA, ARS's conduct independently violates Fla. Stat. § 397.501. The Website functions as a substance abuse service provider platform through which individuals seek and receive referrals, assessments, and information relating to substance use disorder treatment. The records of ARS's interactions with Website users, including information relating to their identity, diagnosis, prognosis, and the substance abuse services they are seeking, are confidential under § 397.501 and may not be disclosed without written consent. ARS's real-time transmission of user identification and browsing data to Google and Microsoft's advertising platforms, without written consent, violates § 397.501 and the confidentiality protections it mandates.

44

88.     ARS's conduct further violates the spirit and purpose of 42 U.S.C. § 290dd-2 and 42 C.F.R. Part 2. These federal provisions reflect Congress's determination that substance use disorder treatment records require even greater confidentiality protections than other medical records, because disclosure of addiction treatment-seeking can cause uniquely severe harm to patients. By transmitting Website users' addiction treatment-seeking behavior to advertising platforms, ARS has done precisely what these provisions were enacted to prevent: exposing individuals who seek help for addiction to the risk that their treatment-seeking status will be disclosed to, exploited by, and commercially leveraged by third parties without their knowledge or consent.

## I.  Plaintiff's Specific Experience

89.     Plaintiff Teresa Latimore is a Florida resident who visited the Website in or about January and February 2026. Ms. Latimore accessed the Website using the Google Chrome browser on her Samsung Galaxy mobile device. Ms. Latimore did not use ad blockers, "incognito" mode, or a VPN, meaning the Trackers embedded on ARS's Website were fully operational during her visits. Before interacting with the Website, Ms. Latimore was not presented with any adequate disclosure or affirmative consent mechanism advising her that her addiction treatment-related browsing activity, assessment interactions, insurance inquiries, or call activity would be transmitted to Google or Microsoft.

90.     During her visits to the Website, Ms. Latimore completed an online addiction self-assessment questionnaire, seeking to determine whether a facility such as The Recovery Village might meet her treatment needs. Those assessment interactions were intercepted in real time and transmitted to Google through Google Analytics and to Microsoft through Clarity and Bing UET,

45

along with their respective unique identifying cookies, all without Ms. Latimore's knowledge or consent.

91. Ms. Latimore also used the Website to search for addiction treatment facilities in the Florida area, including viewing the facility locations available near her. She also used the insurance verification feature on the Website to determine whether her health insurance carrier would cover ARS's substance abuse treatment programs—her primary concern in evaluating ARS as a potential treatment provider. Her location searches and insurance inquiries were likewise intercepted and transmitted to Google and Microsoft in real time.

92. Ms. Latimore also clicked on and called ARS's admissions phone number displayed on the Website during one of her visits. That call interaction was transmitted to Microsoft through Clarity, disclosing the fact that Ms. Latimore had initiated contact with a substance abuse rehabilitation facility.

93. Because ARS utilized the Trackers on its Website, the Third-Party Recipients intercepted and received Ms. Latimore's sensitive health information and electronic communications without her knowledge or consent. At no time did Ms. Latimore consent to the interception of her sensitive information and electronic communications with ARS through the Website by Google or Microsoft, or to ARS enabling those companies to access or intercept such information. Ms. Latimore reasonably expected that her communications with ARS were solely between herself and ARS and that such communications would not be transmitted to or disclosed to third parties.

## INJURY TO PLAINTIFF AND CLASS MEMBERS

94. ARS's procurement of unauthorized interception of Website user communications has caused actual harm to Plaintiff and Class Members in multiple ways.

95.     Invasion of Privacy: The addiction treatment-related, health, and personal information disclosed through Website interactions—including users' completion of addiction assessments, their insurance carrier identity in the context of addiction treatment coverage, their searches for nearby rehabilitation facilities, and their direct contact with ARS's admissions line—constitutes some of the most private information an individual possesses. Its interception and disclosure to advertising companies can result in significant embarrassment, stigma, discrimination in employment and housing, adverse consequences in custody and legal proceedings, and other severe harms unique to the disclosure of substance use disorder treatment-seeking status. Plaintiff and Class Members have suffered an invasion of their privacy through the unauthorized interception of their electronic communications and health-related disclosures. The interception of these communications violated Plaintiff's and Class Members' reasonable expectation that their interactions with ARS would remain private.

96.     Loss of Data Value: Plaintiff and Class Members have been deprived of the economic value of their personal data. In today's digital economy, personal data—especially health-related, addiction treatment, and insurance information—has significant commercial value. ARS has unjustly captured and monetized this value without compensation to Plaintiff or Class Members.

97.     Diminished Confidence in Healthcare Privacy: The unauthorized interception of Plaintiff's and Class Members' communications has undermined their ability to freely and confidentially seek addiction treatment information, explore rehabilitation options, or manage their healthcare without fear that their activities and disclosures are being intercepted by third parties. This chilling effect on treatment-seeking is a concrete harm: it deters individuals struggling with addiction from accessing the online resources and information they need to pursue recovery.

98.    Risk of Further Use of Intercepted Data: Once intercepted by Google and Microsoft, Plaintiff's and Class Members' data is beyond their control. This creates an ongoing risk that their sensitive addiction treatment-related information may be further processed, combined with other data sources, or potentially used by additional third parties, causing continued and future harm.

99.    Statutory Injury: Independent of the above harms, ARS's violation of the FSCA and ECPA has caused Plaintiff and Class Members to suffer statutory injury, entitling them to the remedies provided by law, including statutory damages.

## CLASS ACTION ALLEGATIONS

100.    Plaintiff brings this action on behalf of herself individually and on behalf of all other persons similarly situated pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

101.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

All individuals residing in the United States who visited ARS's Website and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by ARS, including Google and/or Microsoft, within the applicable statute of limitations period.

102.    The Florida Class that Plaintiff seeks to represent is defined as follows:

All individuals residing in Florida who visited ARS's Website and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by ARS, including Google and/or Microsoft, within the applicable statute of limitations period.

103.    Together, the Nationwide Class and the Florida Class are referred to as the "Class."

104.    Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) Google and Microsoft, their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and

48

assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members, and staff, as well as the attorneys for Plaintiff and Defendant and their staff; (e) Plaintiff's attorneys and their staff; and (f) any jurors assigned to this case.

105. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

106. **Numerosity**. The Class is so numerous that joinder of all members is impracticable. ARS is one of the largest behavioral healthcare companies in the United States, operating The Recovery Village network of facilities with substantial national Website traffic. Upon information and belief, the Website receives millions of unique visitors each year, many of whom had their electronic communications intercepted by the Third-Party Recipients during the relevant period.

107. The Class is ascertainable because its members can be identified through objective criteria using records maintained by Defendant and third parties. ARS's web server logs, Google Analytics account data, and Microsoft account data contain records of Website visitors whose electronic communications were intercepted by the Trackers during the applicable statute of limitations period. These records include cookie identifiers, timestamps, and the specific pages and interactions involved. The identities of Class Members can be determined without resort to individualized fact-finding or mini-trials. In addition, ARS collects names and email addresses from users who complete assessments or begin the admissions process, and ARS's own customer relationship management records, together with the advertising account records of the Third-Party Recipients obtainable through discovery, provide objective, reliable means of identifying Class Members.

108.     **Commonality and Predominance**. There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

a.   Whether ARS implemented the Trackers on its Website;

b.   Whether the Trackers intercepted Website users' electronic communications;

c.   Whether ARS procured, enabled, and aided and abetted the interception of Website users' electronic communications;

d.   Whether ARS obtained Website users' consent to procure the interception of their electronic communications;

e.   Whether ARS's conduct violated Chapter 934.03 of the FSCA;

f.   Whether ARS's conduct violated Section 2511 of the ECPA;

g.   Whether ARS was unjustly enriched by the conduct described herein;

h.   Whether Plaintiff and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

i.   Whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to injunctive relief.

109.     These common questions predominate over any individualized issues because Plaintiff's claims challenge ARS's uniform, centralized conduct—the deployment of identical tracking code across its entire Website—rather than any individualized interaction between ARS and a particular Class Member. The Trackers operated in the same manner on every page of the Website, intercepting the same categories of data and transmitting that data to the same third parties using the same cookies and identifiers, regardless of which user visited the Website. Liability can therefore be established on a class-wide basis through common proof, including ARS's Website

source code, its contracts or arrangements with Google and Microsoft, and the technical operation of the Trackers.

110. **Typicality**. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and Class Members all visited ARS's Website and had their electronic communications intercepted by the Third-Party Recipients without their consent. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class Members and are based on the same legal theories.

111. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who are experienced in complex class action litigation, including class actions involving privacy violations, unlawful data collection, and the interception of electronic communications in the healthcare context. Plaintiff's counsel has the resources, expertise, and commitment to prosecute this action vigorously on behalf of the entire Class through discovery, class certification, trial, and any appeals. Plaintiff intends to prosecute this action vigorously and has no interests adverse or antagonistic to those of the Class.

112. **Superiority**. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications. A class action provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

113. Alternatively, Plaintiff seeks certification of an issue class pursuant to Federal Rule of Civil Procedure 23(c)(4) with respect to the common issues identified above. Certification of

those issues—including whether ARS implemented the Trackers on its Website, whether the Trackers intercepted users' electronic communications, whether ARS procured those interceptions, and whether ARS obtained users' consent—would materially advance the litigation, promote uniform adjudication of Defendant's common conduct, and substantially narrow any individualized questions that may remain after the classwide issues are resolved.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF THE FLORIDA SECURITY OF COMMUNICATIONS ACT (Fla. Stat. § 934.03)
(On Behalf of Plaintiff and the Florida Class)

114. Plaintiff incorporates paragraphs 1–113, above, as if fully set forth herein.

115. The FSCA prohibits intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any electronic communication. Fla. Stat. § 934.03(1)(a). Unlike the federal Wiretap Act, the FSCA is an all-party consent statute, requiring the consent of all parties to the communication. Fla. Stat. § 934.03(2)(d).

116. The FSCA defines "intercept" as "the aural or other acquisition of the contents of any electronic communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3). It further defines "contents" as "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). Florida courts have confirmed that the FSCA was specifically "designed to protect precisely the information at issue in this case— private medical information." *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *4 (M.D. Fla. Mar. 6, 2025).

117. The Trackers deployed on ARS's Website constitute "electronic, mechanical, or other device[s]" within the meaning of the FSCA. The Trackers at issue here actively intercept and transmit the contents of users' communications, including specific URLs encoding addiction-

related page views, assessment interactions, location searches, insurance selections, and admissions activity.

118.    The transmissions between Plaintiff and Class Members and ARS's Website constitute "electronic communications" within the meaning of the FSCA because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system. Fla. Stat. § 934.02(12).

119.    The Trackers intercept the "contents" of Plaintiff's and Class Members' electronic communications, not merely routing or addressing information. The specific page URLs visited by users—encoding the user's navigation to addiction assessment pages, meth treatment information, heroin addiction assessments, admissions forms, insurance verification pages, and location search results—plainly constitute "information concerning the substance, purport, or meaning" of the user's communication within the meaning of Fla. Stat. § 934.02(7). *See W.W.,* 2025 WL 722892, at \*4–5 (finding URLs reflecting medical services sought constitute "contents" under the FSCA); *Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1321 (S.D. Fla. 2021).

120.    ARS intentionally procured Google and Microsoft to intercept these electronic communications by deliberately implementing the Trackers on its Website. Plaintiff and Class Members did not consent to this interception.

121.    As a direct result of ARS's violations, Plaintiff and Class Members are entitled to: (a) actual damages or statutory damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and costs of litigation under Fla. Stat. § 934.10. Plaintiff and Class Members are also entitled to

injunctive relief to prevent ARS from continuing to implement Trackers that intercept their electronic communications without proper consent.

## COUNT II: VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT (18 U.S.C. § 2511 et seq.)
### (On Behalf of Plaintiff and the Nationwide Class)

122.    Plaintiff incorporates paragraphs 1–113, above, as if fully set forth herein.

123.    The ECPA prohibits the intentional interception of electronic communications, and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

124.    The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2520(a).

125.    The transmissions between Plaintiff and Class Members and ARS's Website are "transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system that affects interstate commerce" and therefore constitute "electronic communications" within the meaning of the ECPA. 18 U.S.C. § 2510(12).

126.    The Trackers intercepted the "contents" of Plaintiff's and Class Members' electronic communications within the meaning of the ECPA, for the same reasons set forth above with respect to the FSCA.

127.    Although the ECPA contains a one-party consent exception, 18 U.S.C. § 2511(2)(d), that exception does not apply here because the communications were intercepted for the purpose of committing criminal and tortious acts in violation of the Constitution or laws of the United States and the State of Florida. Specifically, the crime-tort exception to the one-party consent rule applies because ARS procured the interceptions for the purpose of using and

54

disclosing users' individually identifiable health information to third parties for commercial advantage without authorization, in violation of HIPAA, 42 U.S.C. § 1320d-6. ARS's conduct also violated Fla. Stat. § 397.501, which provides an independent basis for the crime-tort exception. A disclosure that violates HIPAA or Fla. Stat. § 397.501 is a violation of law independent of the ECPA. *See Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025); *W.W.*, 2025 WL 722892, at *6–7 (M.D. Fla. Mar. 6, 2025); *Kurowski v. Rush System for Health*, 2023 WL 2349606 (N.D. Ill. Mar. 3, 2023); *Pattison v. Teladoc Health, Inc.*, No. 23-cv-11305 (S.D.N.Y. June 25, 2025).

128. ARS's knowing violation of HIPAA is established by, among other things, its own publication of a HIPAA Notice of Privacy Practices and its awareness of HHS's December 2022 guidance specifically warning covered entities that pixel tracking on healthcare websites violates HIPAA. ARS's continued deployment of the Trackers after this guidance was issued reflects a knowing and deliberate choice to prioritize advertising revenue over its legal obligations.

129. ARS intentionally procured Google and Microsoft to intercept these electronic communications by deliberately implementing the Trackers on its Website, within the meaning of 18 U.S.C. § 2511(1)(a). Users did not consent to ARS's procurement of third-party interception or to the sharing of their addiction assessment interactions, admissions activity, insurance verifications, location searches, and associated identifiers for advertising, analytics, retargeting, or conversion-optimization purposes.

130. ARS was not acting under the color of law when procuring these interceptions, and no other exception to ECPA liability applies.

131.    As a direct result of ARS's violations, Plaintiff and Class Members are entitled to: (a) actual damages or statutory damages of $100 per day per violation or $10,000, whichever is greater; (b) punitive damages; and (c) reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

**COUNT III**
**UNJUST ENRICHMENT**
(On Behalf of Plaintiff and the Nationwide Class)

132.    Plaintiff re-alleges and incorporates by paragraphs 1–113, above, as if fully set forth herein.

133.    Plaintiff and the Class members conferred a direct and measurable benefit upon Defendant by visiting the Website and interacting with its features, including its addiction assessment tools, insurance verification portal, location finder, and related website content.

134.    Through those interactions, Plaintiff and the Class members provided Defendant with their sensitive, individually identifiable health information—including the nature of their substance use concerns, the addiction-related services they sought, their geographic location, and their insurance coverage—information that carries significant commercial value in the healthcare marketing and digital advertising markets.

135.    Unbeknownst to Plaintiff and the Class, Defendant embedded third-party tracking code from Google and Microsoft within its website, which caused users' private health and addiction-related data to be automatically transmitted to those third parties in real time during each website visit.

136.    Defendant derived a concrete economic benefit from this unauthorized transmission, including but not limited to: reduced advertising costs through targeted retargeting campaigns, enhanced conversion analytics, access to behavioral data profiles, and improved

56

marketing performance—all funded by the exploitation of Plaintiff's and Class members' private health information.

137.    Defendant acquired and retained these benefits at the direct expense of Plaintiff and the Class, who received no compensation, notice, or meaningful opportunity to consent to the commercial use of their sensitive personal and health-related data.

138.    Defendant's privacy policy and Notice of Privacy Practices expressly represented that it would not use or disclose users' health information for marketing purposes without authorization, and that it would not sell users' health information without written authorization. Plaintiff and the Class members reasonably relied on these representations. Defendant's covert data-sharing practices were directly contrary to those representations.

139.    Under these circumstances, it would be inequitable and unjust for Defendant to retain the benefits it received through the unauthorized collection and commercial exploitation of Plaintiff's and Class members' private health information.

140.    Plaintiff and the Class are entitled to restitution, disgorgement of Defendant's ill-gotten gains, and/or such other equitable relief as the Court deems appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and on behalf of all other Class Members similarly situated, respectfully requests that this Court:

a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

b) Declare that ARS's actions, as described herein, violate the FSCA and the ECPA, and constitute unjust enrichment;

c)  Award Plaintiff and the Class compensatory damages in an amount to be determined at trial;

d)  Award Plaintiff and the Class statutory damages as provided by the FSCA and ECPA;

e)  Award Plaintiff and the Class restitution of all economic benefits Defendant derived from the unauthorized commercial use of Plaintiff's and Class members' private health and addiction-related information, disgorgement of Defendant's profits attributable to such use, and such other equitable relief as the Court deems just and proper.

f)  Award Plaintiff and the Class punitive damages;

g)  Award injunctive relief requiring ARS to cease procuring the interception of Website users' communications without proper consent; disable or segregate Trackers from addiction assessment pages, admissions forms, and other sensitive pages unless valid consent and authorization are obtained; request deletion of improperly transmitted data from the Third-Party Recipients to the extent within ARS's control or contractual rights; and implement appropriate safeguards to protect Website users' privacy in the future;

h)  Award Plaintiff and the Class pre-judgment and post-judgment interest;

i)  Award Plaintiff and the Class reasonable attorneys' fees and costs, as allowed by law; and

j)  Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: June 16, 2026

Respectfully submitted,

By: */s/ Adam A. Schwartzbaum*

Adam A. Schwartzbaum, Esq.
Florida Bar No. 93014
**SCHWARTZBAUM**
14 NE 1st Ave Ste 705
Miami, FL 33132
Telephone: 786-453-8485
Primary Email: adam@schwartzbaum.com
Secondary Email: admin@schwartzbaum.com

*Counsel for Plaintiffs and the Proposed Class*

59